# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TIARE RAMIREZ, | Case No.: 2:19-cv-01174-APG-BNW |
| Plaintiff | **Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment and Denying as Moot Defendant's Motion to Strike** |
| v. | |
| WYNN LAS VEGAS, LLC, | [ECF Nos. 57, 70] |
| Defendant | |

Plaintiff Tiare Ramirez worked as a cocktail server at defendant Wynn Las Vegas, LLC. In July 2016, Wynn approved Ramirez for one year of intermittent leave under the Family and Medical Leave Act (FMLA) for her ankle condition. In March 2017, Ramirez wore high heels to a party. She experienced a flare up of her ankle condition and called off work under her intermittent FMLA leave prior to her shift that evening. Later, a supervisor at Wynn saw a photo posted on Facebook of Ramirez at the party. When Ramirez returned from an unrelated medical leave taken under the Americans with Disabilities Act (ADA), she was suspended pending an investigation. Wynn eventually terminated Ramirez for dishonesty, willful misconduct, and misuse of her FMLA leave.

Ramirez sued Wynn for violations of the FMLA; violations of the ADA; retaliation; and negligent hiring, training, and supervision. ECF No. 1-3 at 9-14. Wynn now moves for summary judgment, and Ramirez opposes. ECF Nos. 57; 64. Because questions of fact remain as to all but one of Ramirez's claims, I grant in part and deny in part Wynn's motion for summary judgment.

/ / / /

/ / / /

/ / / /

# I. BACKGROUND

A. *Job Responsibilities*

Ramirez worked as a cocktail server at Wynn since November 2008. ECF No. 57-3 at 8. Wynn's cocktail servers are required to walk in shoes with heels of at least either one-and-three-quarters of an inch, or two inches. *See* ECF No. 57-4 at 3 (cocktail server model job summary stating servers must walk in shoes with heel of at least one-and-three-quarters of an inch); 57-5 at 2 (cocktail servers' conditions of employment stating uniform includes shoes with at least two-inch heel).  Ramirez acknowledged that she understood and agreed to this condition of employment around the time she was hired. *See* ECF No. 57-5 at 2; *see also* ECF No. 57-3 at 9.

B. *Leave Policies*

Under Wynn's attendance policy, employees accrue points for attendance infractions. ECF No. 57-6.  Employees do not accrue points for approved leave. *Id.* at 2-3.  Ramirez understood that she would not accrue points for approved leave. ECF No. 57-3 at 10.  According to Wynn's policy, if an employee accrues eight points, they will be suspended pending an investigation and may be terminated. ECF No. 57-6 at 4.

Wynn maintained a leave policy that allowed eligible employees to use leave under the FMLA. ECF No. 57-7.  Employees who are employed for at least 12 months and worked at least 1,250 hours during the 12 months prior may take leave under this policy for their own serious health condition that renders them incapable of performing the functions of their job. *Id.* at 2-3. Ramirez acknowledged that she received this policy in July 2009. ECF No. 57-8.[1]

---

[1] Several of the policy acknowledgments in this record were signed by Tiare Thieu, which I assume is Ramirez.  Neither party raises an issue with this acknowledgment.

Ramirez was also entitled to leave under a Collective Bargaining Agreement (CBA) between Wynn and her union. ECF No. 57-12 at 2-3; *see also* ECF Nos. 57-14 at 2 (Ramirez's work summary stating she had taken Medical 13.01 leave), 57-11 at 7 (Karen Sanchez testifying that Medical 13.01 is medical leave under the union contract). Employees are entitled to six months of this leave during a 12-month period for their own serious health condition. ECF No. 57-12 at 4.

Between April 2009 and November 2017, Ramirez took at least 24 leaves of absence. ECF No. 57-14 at 2-4. The reasons listed for these leaves are: ADA leave, medical leave under the CBA, FMLA medical leave, FMLA intermittent leave, personal leave, child rearing leave under the CBA, and Wynn medical leave. *Id.*

C. *Ramirez's Ankle Condition and FMLA Intermittent Leave*

Ramirez's doctor, Ted Cohen, submitted a certification for Ramirez's serious health condition for FMLA leave in June 2016. ECF No. 57-15. Dr. Cohen wrote that Ramirez had "painful ankles B/L & chronic tendonitis." *Id.* at 3. He explained that Ramirez has "a chronic ankle condition that requires rest & time off for flare [sic] ups . . . [she] need[s] to reduce heel height on shoes to improve condition. Chronic ankle condition – needs time off when she can't walk." *Id.* at 4. He wrote that it was medically necessary for Ramirez to be absent from work during flare-ups, and that "when she's unable to walk . . . she's to stay home." *Id.* The certification lists long periods of standing as one job function that Ramirez cannot complete. *Id.* at 3.

Ramirez testified that Dr. Cohen did not instruct her to not wear high heels. ECF No. 64-7 at 13. She testified that he told her to wear low heels specifically at work. *Id.* In July 2016,

Wynn approved Ramirez for intermittent FMLA leave for her serious health condition from June 3, 2016 through June 2, 2017. ECF No. 57-16 at 2.

D. *March 21, 2017 Absence*

Ramirez was scheduled to work at Wynn on March 21, 2017 beginning at 5:30 p.m. ECF No. 57-3 at 13.  Earlier that day, at about 2:30 p.m., Ramirez arrived at a gender reveal party at a bar. ECF No. 64-7 at 11-12.  She wore brand new heels to the event. *Id.* at 12.  At around 4:19 p.m., Ramirez walked from the bar to her car, changed into flat shoes, and then called Wynn to use her intermittent FMLA leave. *Id.* at 19-20.  She then walked to a different bar. *Id.* at 22.  She testified that the walk to the second bar was 20 or 30 feet from her car. *Id.* at 23.  She also testified that she went to the second bar because she needed to eat food to take her pain medication. *Id.*  When she arrived at the bar, she ordered food. *Id.*  Ramirez left the bar around 5:00 p.m., picked up her children, and went home. *Id.* at 24.

 On March 21 at 6:42 p.m., a photo was posted to Facebook showing a group of people, Ramirez and at least one of her co-workers, Ian Lacuesta, seemingly at the party. *See* ECF Nos. 57-18; 57-17 at 7.  The photo appears to have been taken at 4:06 p.m. on March 21. ECF No. 64-26.  At some point in March, Tia Gibson, Wynn's Assistant Director of Cocktail Services, saw the photo and sent it to Jeralynn Makaiwi, Wynn's Employee Relations Counselor. ECF No. 57-17 at 6.

On March 22, Ramirez saw Dr. Cohen to receive pain shots. ECF No. 64-7 at 24, 40. That same day, Lacuesta wrote a statement that on "March 21, 2017, [he] attended a gender reveal party . . . from 2:00 pm to 4:00 pm.  Tiare Ramirez was present at the party, and was still there by the time I left at approximately 6:00 pm." ECF No. 57-22; *see also* ECF No. 64-25 at 5 (Lacuesta testifying that he wrote this statement on March 22); *but see id.* at 8 (Lacuesta

4

1  testifying that there was nothing done to verify the date of the statement that he wrote using a

2  word processing program).

3      Lacuesta explained during his deposition that the party changed venues after the official

4  end of the party at 4:00 p.m., and Ramirez was present at the second location when he left

5  around 6:00 p.m. *See* ECF Nos. 57-22; 57-21 at 7.  Lacuesta also testified that the event at the

6  second bar was "thrown together pretty quickly" and "could have been classified as like an after

7  party but it wasn't anything official." ECF No. 64-25 at 31.  Lacuesta testified that an incident

8  occurred at the second bar when Ramirez and her husband got into an argument with some other

9  individuals at the bar. ECF No. 57-21 at 8.  Lacuesta testified that the employees at the bar

10 notified him[2] that they were calling security, so he decided to leave. *Id.*  He testified that

11 Ramirez and her husband then left the bar. *Id.* at 9.  He testified he left the bar between 6:00 and

12 6:30 p.m. *Id.* at 10; *see also* ECF No. 64-25 at 27 (Lacuesta testifying he knew he left between

13 6:00 and 6:30 p.m. because the sun was setting).  Ramirez testified that Lacuesta did shots of

14 alcohol at the gender reveal party, and Lacuesta could not recall how much he drank that day.

15 *See* ECF Nos. 64-7 at 14; 64-25 at 27.

16     According to Makaiwi, had Ramirez called out of work using a normal absence instead of

17 an FMLA intermittent leave absence, she would have received attendance points for this call out

18 that would have resulted in her being placed on suspension and possibly terminated. ECF No.

19 57-19 at 7-8.  But, in January 2017, when Ramirez accrued eight attendance points "after being

20 denied FMLA," she received only a second written warning, as opposed to being suspended as

21 the policy provides. ECF No. 57-10; *see also* ECF No. 57-9 (Ramirez's first written warning

22 received in December 2016 after accruing five attendance points).

23

---

[2] Lacuesta refers to "us" in this portion of his testimony, but it is not clear who "us" is.

E. *March 22 – October 14, 2017*

Ramirez did not report to work on her next scheduled workday after March 21, 2017. ECF No. 57-3 at 23-24.  Instead, she requested a leave of absence for knee surgery. *Id.*  Makaiwi testified that she was supposed to meet with Ramirez on March 22 to question her about the March 21 leave but did not because of this medical leave. ECF No. 57-19 at 6.  She testified that Ramirez would have been placed on suspension at that point had Wynn determined that it still needed to investigate. *Id.*  Instead, Ramirez was not suspended pending investigation because Wynn would not address a suspension while Ramirez was on leave. *Id.*

Ramirez was on a leave of absence under the CBA's medical leave provision from March 22 until September 15, and then under the ADA from September 15 until October 14, 2017. ECF No. 57-14 at 2; *see also* ECF No. 57-27 at 2 (ADA Administrator's notes stating Ramirez was on leave under the CBA from March 22 until September 14, and under the ADA from September 15 through December 29, but also stating that Ramirez's ADA leave was temporarily approved on September 22).  Ramirez was released to work with no restrictions on October 14, 2017. ECF No. 57-29.

F. *Investigation*

Wynn claims that "Gibson . . . and Makaiwi met with Lacuesta on March 22, 2017, commencing the investigation into Ramirez's misuse." ECF No. 57 at 6.  But the record cited does not support this timeline.  Rather, Makaiwi testified that she did not speak with Lacuesta prior to the unemployment hearing in this matter, though the parties have not told me when that hearing was. ECF No. 57-20 at 8.  Lacuesta does not remember who told him to write his March 22 statement. ECF No. 57-21 at 6.

Karen Sanchez was Wynn's leave-of-absence administrator at all relevant times. ECF No. 76-1 at 6.  Her job duties included "process[ing] FMLA" leave and leave under the CBA. *Id.* Sanchez testified that if Wynn suspected Ramirez of misusing FMLA in 2017, she should have been the one to investigate. *Id.* at 9; *see also id.* at 13 (Sanchez testifying that she would have been involved in Ramirez's supposed FMLA misuse if she had been notified that Ramirez was misusing FMLA leave).  But Sanchez was not involved in Ramirez's termination. *Id.* at 19.

Rather, Makaiwi was the principal investigator into Ramirez's alleged misuse of leave. *Id.* at 7; ECF No. 64-6 at 10.  No one from Wynn gave Makaiwi any practice or advice on the specific way that she conducted investigations. ECF No. 64-3 at 25.  Makaiwi is not aware of any specific FMLA guidelines on how employers conduct investigations. *Id.* at 17.  Makaiwi testified that she knows she does not seek statements from spouses for investigations, but that she could request a statement from somebody outside of Wynn. *See id.* at 29, 47.  Makaiwi did not think the FMLA prohibited her from reaching out to doctors. *Id.* at 31.  She believed she could ask an employee's doctor any question, and while she did not know what a doctor could answer in regard to an employee's FMLA investigation, it was up to the doctor to answer her questions or not. *Id.* at 33.  Wynn never provided her any guidance on what she could ask a doctor during an FMLA investigation. *Id.* at 35.

When Ramirez returned to work on October 14, she was suspended pending an investigation. ECF Nos. 57-14 at 2; 57-30.  Two days later, Ramirez met with Makaiwi about her calling out of work on March 21. ECF No. 57-3 at 27.  Ramirez told Makaiwi that she wore new heels to the party on March 21 and that she left the party at 4:00 p.m. ECF No. 57-3 at 27; *see also* ECF No. 57-31 (Ramirez's October 16 statement stating she left the party between 4:00-5:00 p.m.).  Ramirez testified that Makaiwi said that Ramirez had an accommodation to wear

flats, and that Ramirez's paperwork said she was not supposed to wear high heels. ECF No. 57-3 at 27.  Ramirez replied that she would get information from her doctor that "didn't state what [Makaiwi] was saying." *Id.* at 28.  Ramirez wrote a statement that day that stated that her doctor had said she was allowed to wear heels, but not for long periods of time, and if she is able to sit. ECF No. 57-31.  Her statement also said that while she was at the party, her feet began to swell and were so painful that she called off work. *Id.*  Ramirez did not tell Makaiwi that she went to a second bar on March 21 because Makaiwi did not ask. ECF No. 57-3 at 30.  Ramirez testified that Makaiwi asked her if she was still at the gender reveal party at 6:00 p.m., and there was no other follow-up on that. *Id.*  Ramirez did not feel like she needed to offer what she did after she left the party to go off on her own to eat. *Id.* at 31.  Later that night, the host of the gender reveal party emailed Makaiwi and stated that everyone left the party by 4:00 p.m., including Ramirez. ECF No. 64-12 at 2.

On October 19, Dr. Cohen emailed Makaiwi. ECF No. 57-33.  Dr. Cohen stated that while Ramirez has been given permission to wear a low heel shoe, "she must be able to sit for short periods when she is at work and/or an extended shift." *Id.* at 2.  The email states that if Ramirez can rest during her shift, then she does not need to stay home, and she is restricted from strenuous activities including extended standing. *Id.*  Notes from Ramirez to Dr. Cohen state "ok to wear heels for short periods of time, given there is access to sit." ECF No. 57-32.  It is not clear when these notes were written, though there are two dates written on the page: May 22, 2017 and March 21 or 31, 2017. *Id.*  Ramirez does not seem to dispute that Ramirez wrote these notes.  Makaiwi never reached out to Dr. Cohen during her investigation, but she testified Wynn would not normally contact Dr. Cohen. ECF No. 64-3 at 35.

On October 27, Makaiwi emailed Gibson and two others stating that "we are moving forward" with terminating Ramirez for "[w]illful [m]isconduct, [d]ishonesty & [m]isuse of FMLA/ADA." ECF No. 57-34 at 4; *but see* ECF No. 64-6 at 37 (Makaiwi testifying she does not recall if she suggested Ramirez's records reflect that Ramirez was being terminated due to dishonesty). Gibson testified that she recommended Ramirez be terminated for willful misconduct and dishonesty. ECF No. 64-5 at 9-10. Gibson did not receive training or instruction on what constitutes willful misconduct. *Id.* at 11. Gibson left a message for Ramirez on November 1, seemingly to schedule a resolution meeting for the following day. *See* ECF Nos. 57-34 at 2; 57-35.

Later that day, Ramirez emailed Makaiwi to tell her that she has a receipt from 4:58 p.m. on March 21 that "proves [she] had left the baby shower." ECF No. 57-35 at 2; *see also* ECF Nos. 64-7 at 31-33; 64-10. Ramirez asked Makaiwi to tell Ramirez if she should set up an appointment with her bank to share the receipt and information. ECF No. 57-35 at 2. She also stated that she has bank records that she saw her doctor on March 22 for inflammation shots. *Id.* The next day, Ramirez emailed Makaiwi stating that because she had not heard from Makaiwi, she set up the phone conference with her bank to coincide with the resolution meeting. ECF No. 57-36 at 2.

At some point, Ramirez provided either Makaiwi or someone else at Wynn a screenshot of the photo that had been posted on Facebook, with a time stamp indicating that the photo had been taken at 4:06 p.m. ECF Nos. 64-7 at 17-18; 64-26. Also at some point, Ramirez provided Makaiwi with a photo of her swollen feet from March 21. ECF Nos. 64-7 at 24; 64-11.

Ramirez was terminated on November 2, 2017 for "[w]illful [m]isconduct, [d]ishonesty and [m]isuse of FMLA/ADA." ECF No. 57-37 at 2.

1   **II. MOTION FOR SUMMARY JUDGMENT**

2        Summary judgment is appropriate if the movant shows "there is no genuine dispute as to

3   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

4   56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."

5   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence

6   is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

7        The party seeking summary judgment bears the initial burden of informing the court of

8   the basis for its motion and identifying those portions of the record that demonstrate the absence

9   of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

10  burden then shifts to the non-moving party to set forth specific facts demonstrating there is a

11  genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

12  Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a

13  genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and

14  reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of

15  Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).  At this stage, "credibility determinations, the

16  weighing of the evidence, and the drawing of legitimate inferences from the facts" are not my

17  functions; those are "jury functions." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018,

18  1034 (9th Cir. 2006).

19       A. *First Claim – FMLA Violations*

20          1.  <u>FMLA Interference Claim</u>

21       Wynn argues that Ramirez's leave was not medically necessary because if Ramirez's

22  ankle condition prevented her from wearing heels at work, it also prevented her from doing so

23  outside of work, and if it prevented her from walking, then she should not have been able to walk

from her car to the second bar on March 21. It contends that her decision to wear high heels effectively caused her need for FMLA leave and demonstrates that her leave was not medically necessary. Wynn also argues in its reply that Ramirez's actions suggest that she was not so incapacitated due to her medical condition while on leave that she was unable to perform the functions of her position.

Wynn also argues that Ramirez cannot prove her termination was causally linked to her taking leave because Wynn granted Ramirez all the leave she was entitled to under the FMLA, plus additional leave under the ADA and the CBA. It contends the fact that it did not conclude its investigation or terminate Ramirez until almost seven months after the leave in question demonstrates that it was not motivated by Ramirez's FMLA use when it terminated her. Wynn further asserts that it terminated Ramirez for being dishonest regarding remaining at the second bar after the gender reveal party and regarding her need to use her leave on March 21. According to Wynn, it had an honest, good faith belief that Ramirez misused her FMLA leave, warranting summary judgment on this claim. Wynn contends that the evidence shows that Ramirez had no intention of reporting to work after the gender reveal party, and she only used FMLA leave to avoid exceeding allowed attendance points.

Ramirez responds that Wynn's contradictory testimony and subjective investigation make summary judgment improper. She argues that issues of fact remain because Sanchez should have handled Ramirez's FMLA misuse investigation, Wynn did not respond to the email from the host of the gender reveal party, and Wynn provided no checklist for FMLA misuse investigations. Ramirez responds that she was not prohibited from wearing heels outside of work and Wynn's argument that Dr. Cohen's orders were not medically necessary is without

medical authority.  Ramirez contends Wynn cannot demonstrate it had a good faith belief

Ramirez was dishonest because Wynn did not contact Dr. Cohen following his October 19 email.

The FMLA provides job security to employees who must be absent from work up to 12

weeks because of serious health conditions. 29 U.S.C. § 2612.  Eligible employees may take

FMLA leave on an intermittent or reduced schedule basis when medically necessary due to the

serious health condition of a covered family member or the employee. 29 C.F.R. § 825.203.  It is

a violation of the FMLA for an employer to "interfere with, restrain, or deny the exercise of or

the attempt to exercise any right provided under [this act]." 29 U.S.C. § 2615.

Courts have recognized two separate causes of action on FMLA claims: (1) retaliation or

discrimination and (2) interference. *See Sanders v. City of Newport*, 657 F.3d 772, 777-78 (9th

Cir. 2011).  An employer "cannot use the taking of FMLA leave as a negative factor in

employment actions, such as hiring, promotions or disciplinary actions." *Bachelder v. Am. West

Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (emphasis omitted, quoting 29 C.F.R.

§ 825.220(c)).  The Ninth Circuit construes claims alleging that employers have "visit[ed]

negative consequences on an employee simply because [s]he has used FMLA leave" as

interference claims, rather than retaliation or discrimination claims. *Id.* at 1124.  Though

Ramirez's complaint uses the terms "retaliation" and "discrimination," her claim is properly

construed as an FMLA interference claim because she alleges Wynn terminated her for taking

FMLA leave. ECF No. 1-3 at 9-10.  Indeed, Ramirez's opposition to Wynn's motion does not

address an FMLA retaliation or discrimination claim. *See Bachelder*, 259 F. 3d at 1124

(explaining that FMLA's "anti-retaliation" and "anti-discrimination" provisions prohibit

"discriminat[ion] . . . for opposing any practice made unlawful by the subchapter" and

"discrimination . . . for instituting or participating in FMLA proceedings or inquiries" and do not

"cover visiting negative consequences on an employee simply because he has used FMLA leave") (simplified).

To state a claim for FMLA interference, a plaintiff must "prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her." *Bachelder*, 259 F.3d 1112 at 1124-25.  An employee "can prove this claim . . . by using either direct or circumstantial evidence, or both." *Id*.  Proximity in time may be circumstantial evidence that the leave request was a negative factor in the employer's decision. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003).  But proximity must be considered in factual context. *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) (rejecting a "a per se rule that a specified time period is too long to support an inference of retaliation" because "well-advised retaliators will simply wait until that period has passed" and then act "with impunity").

Viewing the evidence in the light most favorable to Ramirez, there is a question of fact over whether Ramirez's leave was medically necessary and whether Ramirez was able to perform her job when she took leave.  Ramirez presented evidence of her FMLA leave certification from Dr. Cohen stating that she was required to take time off during flare-ups, that she was in severe pain on March 21 prior to her shift, and that she received pain medication for her condition the next day.  A reasonable jury therefore could find that Ramirez's leave on March 21 was medically necessary.

A reasonable jury could also find that Ramirez's leave constituted a negative factor in Wynn's decision to terminate her.  Wynn has pointed to evidence in the record to support its argument that it believed that Ramirez was dishonest regarding her activity following her calling out of work on March 21 as well as whether she needed leave on March 21. *See, e.g.*, ECF Nos.

57-3 at 27 (on October 16, Ramirez told Makaiwi that she wore new heels to the party on March 21 and that she left the party at 4:00 p.m.); 57-31 (Ramirez's October 16 statement stating she left the party between 4:00-5:00 p.m.); 57-18 (photo posted to Facebook at 6:42 p.m. of Ramirez at the party in heels); 57-22 (Lacuesta's statement that Ramirez was at the party when he left at 6:00 p.m.).

But viewing the evidence in light most favorable to Ramirez, there is a genuine question over Wynn's belief.  First, a reasonable jury could consider the proximity in time between Ramirez's request for leave on March 21 and her termination on November 2 as circumstantial evidence that her request was a negative factor in Wynn's decision because, as Makaiwi testified, Wynn would not suspend or terminate Ramirez while Ramirez was on leave from March 22 through October 14. ECF No. 57-19 at 6.  Instead, Ramirez was suspended pending an investigation on the first day that Wynn would address such a suspension, and she was terminated less than three weeks later.  Viewing the evidence in the context of Wynn being unable to investigate and suspend Ramirez between March 22 and October 13, the proximity between Ramirez's request for FMLA leave on March 21 and her termination on November 2 may provide circumstantial evidence that her request was a negative factor in Wynn's decision.

There is also a genuine issue over whether Ramirez's leave constituted a negative factor in Wynn's decision to terminate her. *See, e.g.*, ECF Nos. 57-3 at 30 (Makaiwi did not ask Ramirez during the investigation whether she went to a second bar on March 21 or follow-up on Ramirez's answer to whether she was still at the party at 6:00 p.m.); 64-12 at 2 (gender reveal party host emailing Makaiwi that everyone left the party by 4:00 p.m.); 57-35 at 2 (Ramirez's email to Makaiwi that she had a receipt from 4:58 p.m. on March 21 that "proves [she] had left the baby shower"); 57-34 at 4 (Makaiwi's email stating Wynn was "moving forward" with

terminating Ramirez for "[w]illful [m]isconduct, [d]ishonesty & [m]isuse of FMLA/ADA"); 64-6 at 37 (Makaiwi testifying she does not recall if she suggested Ramirez's records reflect that she was being terminated due to dishonesty); 76-1 at 9, 13 (Sanchez testifying that if Wynn suspected Ramirez of misusing FMLA in 2017, she should have been the one to investigate).  As just one example, Wynn contends that it believed Ramirez misused her FMLA leave, but it did not reach out to Dr. Cohen, the doctor who could have confirmed Ramirez's need for FMLA leave. *See* ECF No. 64-3 at 19 (Makaiwi did not reach out to Dr. Cohen during her investigation).  Though Wynn argues it is not required to do so and points to Equal Employment Opportunity Commission (EEOC) guidance stating that employers need not communicate with health care providers, the evidence still raises a dispute over Wynn's belief, and I do not weigh the evidence at this stage.  And while Wynn argues its having granted Ramirez leave in the past demonstrates it did not terminate her for her use of FMLA leave, the fact that Wynn previously granted leave does not preclude the possibility that it considered Ramirez's use of FMLA leave as a negative factor in her termination.  Given a genuine dispute of fact remains on Ramirez's FMLA interference claim, I deny Wynn's motion for summary judgment on this claim.

   B. *Second Claim – ADA & NRS § 613.330 Violations*

   Ramirez's complaint alleges Wynn would not provide cushioned floor mats or allow her to wear flats while working. ECF No. 1-3 at 11.  She claims that Wynn discriminated against her by failing to provide her a reasonable accommodation, failing to engage in an interactive process, not providing Ramirez the tools to do her job, and terminating her. *Id.*

    1. Failure to Accommodate

   Wynn argues Ramirez never requested an accommodation that she did not receive.  It contends that mats were placed at a bar where Ramirez worked.  It contends that Dr. Cohen's

certification did not require flats, and Wynn allows cocktail servers to wear shoes with as low as a quarter of an inch heel.  Wynn also points out that Ramirez had two options for shoes, including a lower heel option, and a Wynn employee reached out to her to engage in the interactive process when she was informed that she needed an approved accommodation to wear flats.  Ramirez does not respond to Wynn's arguments.

Title I of the ADA prohibits employers from discriminating against qualified individuals with disabilities. *Bass v. Cnty. of Butte*, 458 F.3d 978, 980 (9th Cir. 2006).  The ADA contemplates two types of discrimination: failure to accommodate and disparate treatment. *McGary v. City of Portland*, 386 F.3d 1259, 1265-66 (9th Cir. 2004).  Nevada Revised Statutes (NRS) § 613.330 prohibits discrimination based on disability in the employment context. NRS § 613.330.  A claim for disability discrimination under the Nevada statute is evaluated under the same standard as a federal ADA claim. *Littlefield v. Nev., ex rel. Dep't of Pub. Safety*, 195 F. Supp. 3d 1147, 1152 (D. Nev. 2016).

Under the ADA, "discrimination includes an employer's not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010) (simplified).  "[O]nce the employee requests an accommodation . . . the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002).  But "there exists no stand-alone claim for failing to engage in the interactive process.  Rather, discrimination results from denying an available and reasonable accommodation." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).

Ramirez complained about needing mats in 2012 and they were provided. ECF No. 57-3 at 34-35. Ramirez does not point to any evidence to the contrary. Therefore, no genuine dispute remains that Ramirez received a reasonable accommodation of floor mats.

As to Ramirez's request to wear flats, Ramirez testified that she had the option to wear a lower heel. ECF No. 57-3 at 22. She also testified that following an incident in which Gibson told her that she needed an accommodation to wear flats, a Wynn administrator reached out to her to schedule a meeting to discuss whether she needed accommodations in addition to leave. *Id.* at 20-21. Ramirez does not point to evidence that this interactive process resulted in Wynn failing to provide her a reasonable and available accommodation. I therefore grant Wynn's motion for summary judgment on Ramirez's failure to accommodate claims under the ADA and NRS § 613.330.

### 2. Disparate Treatment

Ramirez's ADA disparate treatment claim is subject to the *McDonnell Douglas*[3] burden-shifting analysis. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). The first step requires the plaintiff to establish a prima facie case of discrimination. *Id.* To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that: (1) she is disabled within the ADA's meaning; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). The plaintiff must show that the adverse employment action would not have occurred but for the disability. *See Murray v. Mayo Clinic*, 934 F.3d 1101, 1104-07 (9th Cir. 2019) (overruling *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053 (9th Cir. 2005)'s holding

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

that ADA discrimination claims are evaluated under a motivating factor causation standard in favor of a finding that a but-for causation standard applies). If the plaintiff presents a prima facie case, "the burden shifts to the defendant to produce some evidence demonstrating a legitimate, nondiscriminatory reason for" an adverse employment action. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004). If the defendant meets that burden, "the plaintiff must then show that the defendant's alleged reason for [the employment action] was merely a pretext for discrimination." *Id.*

### i.   Disabled within the ADA's meaning

Wynn first argues that Ramirez is not disabled within the ADA's meaning because her ankle condition does not substantially limit her major life activities, as evidenced by her wearing brand new high heels to the gender reveal party and the fact that she wears high heels despite her condition. Wynn also points to the fact that Ramirez stayed out socially after calling out from work, and currently serves cocktails for a different employer. Ramirez responds that her need to reduce heel height while at work does not mean she was prohibited from wearing high heels at all times.

Under the ADA, "the term 'disability' means . . . (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). "The definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of [the ADA]." *Id.* at § 12102(4)(A). "The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." *Id.* at § 12102(4)(B); *see also* 29 C.F.R. § 1630.2(j)(1)(i) (EEOC regulations stating "'substantially limits' shall be construed broadly in favor of expansive

coverage . . . [and] is not meant to be a demanding standard.").  Whether an impairment is substantially limiting is measured by assessing "the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* at § 1630.2(j)(1)(ii). "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment." *Id.* at § 1630.2(j)(1)(iv).  However, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis" because "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." *Id.* at § 1630.2(j)(1)(iii).  "[M]ajor life activities include, but are not limited to . . . performing manual tasks, walking, standing, and working." 42 U.S.C. § 12102(2).

Viewing the facts in the light most favorable to Ramirez, a genuine dispute remains over whether Ramirez's ankle condition substantially limits her ability to walk, stand, or work. Ramirez claims she called off work due to a flare up of her ankle condition; she had taken FMLA leave for her ankle condition in the past[4]; and Dr. Cohen's FMLA certification stated that she was to stay home from work when she was unable to walk, so there is evidence that her condition limited her ability to stand and walk while at work.  Wynn has presented no evidence of the circumstances or accommodations of Ramirez's current job.

ii.    Qualified individual able to perform job

Wynn next argues that because the cocktail server job requires cocktail servers to stand for 26-50% of the time and walk for more than 75% of the time, and because Ramirez is unable to stand and walk, she is not a qualified individual with a disability for purposes of the ADA.  It

---

[4] ECF No. 57-14 at 2.

1 contends that Ramirez's past qualification for her role does not demonstrate she was qualified

2 when she was terminated.

3       Ramirez responds that she worked for Wynn for nearly ten years and there is no evidence

4 that she did not have the appropriate employment experience and skills to complete her job.  She

5 argues she performed the essential functions of her job effectively with her FMLA intermittent

6 leave accommodation.

7       I perform a two-step inquiry in determining whether an individual is qualified for a

8 position. *Bates v. United Parcel Serv.*, 511 F.3d 974, 990 (9th Cir. 2007).  I first consider

9 whether the individual satisfies the "requisite skill, experience, education and other job-related

10 requirements" of the position. *Id.*  I then consider whether the individual can perform the

11 essential functions of their position with or without a reasonable accommodation. *Id.*; *see also* 42

12 U.S.C. § 12111(8).

13       Wynn does not argue that Ramirez lacked the skill or experience for her job.  Indeed, she

14 was a cocktail server for almost ten years and had the requisite experience.  Viewing the

15 evidence in the light most favorable to Ramirez, a genuine issue of material fact remains over

16 whether Ramirez could perform the essential functions of her position with or without a

17 reasonable accommodation.  Though cocktail servers need to stand and walk for much of their

18 time at work, Ramirez was able to work as a cocktail server with her work schedule providing

19 intermittent leave from June 2016 until her termination.  It is also possible she could have stood

20 and walked as required by the position had she been provided flat shoes as a reasonable

21 accommodation.

22 / / / /

23 / / / /

1           iii.     <u>Adverse employment action because of her disability</u>

2        Finally, Wynn argues that Ramirez was not terminated because of her disability but

3 because Wynn concluded she misused her FMLA leave to wear high heels to a social event, and

4 there is no evidence that Ramirez was terminated for any other reason.  Ramirez responds that

5 the motivating factor standard applies here.  She contends that the record shows Ramirez stayed

6 out after the party to eat food to take her pain medication, and that she truthfully answered every

7 question Wynn asked.  Elsewhere in her response, Ramirez argues that the close temporal

8 proximity of two weeks between when she returned to work from leave and her termination

9 indicates causation.

10        Viewing the evidence in the light most favorable to Ramirez, a question of fact remains

11 regarding whether she was terminated because of her ankle condition or her leave, and whether

12 Wynn's proffered legitimate, nondiscriminatory reason for terminating Ramirez is pretextual.

13 As explained above, a reasonable jury could find that the temporal proximity between when

14 Ramirez took leave and was terminated is circumstantial evidence of causation between the two

15 events.  Wynn has pointed to evidence in the record to support its argument that it terminated

16 Ramirez for a non-discriminatory reason, namely for being dishonest.  But as I outlined above in

17 the context of Wynn's genuine belief that Ramirez was dishonest, Ramirez has also pointed to

18 evidence demonstrating there is a genuine question whether Wynn's reason is pretextual.

19 Because questions of fact remain regarding Ramirez's ADA disparate treatment claim, I deny

20 Wynn's motion for summary judgment on this claim.

21        C.  *Third Claim – Retaliation under 42 U.S.C. § 2000e et seq. and NRS § 613.340*

22        It is not clear from the complaint or the parties' briefs under what law Ramirez brings her

23 federal retaliation claim.  I construe Ramirez's third claim as being brought under the ADA and

NRS § 613.340 because she cites to 42 U.S.C. § 2000e in her complaint and the ADA's definitions refer to this section throughout. *E.g.*, 42 U.S.C. § 12111 (1), (7).  Additionally, Ramirez's complaint refers to her disability and accommodation in this claim, and an FMLA retaliation claim would be duplicative of her FMLA interference claim. ECF No. 1-3 at 12-13.

Wynn argues that Ramirez did not engage in activity protected by the ADA because she did not request a reasonable accommodation or ADA leave; rather, Wynn instructed her to seek leave under the ADA because she had exhausted her other leave.  Wynn further argues that her purported protected conduct was not the but-for cause for her termination because there is no evidence of temporal proximity between Ramirez taking leave and her termination six months later.  It contends that its providing Ramirez with ADA leave when she had exhausted other leave, her frequent use of FMLA leave, and its investigation demonstrate the lack of causation.

Ramirez responds that she engaged in protected activity by requesting ADA and FMLA leave.  She argues that a causal link exists between her requests and her termination because it is plausible that Wynn grew tired of being inconvenienced by Ramirez's medical condition and decided to terminate her.  Ramirez argues that Wynn terminated her about two weeks after she returned to work from leave, and such a close temporal proximity indicates causation.

To establish an ADA retaliation claim, Ramirez first must make out a prima facie case that she was engaged in protected activity, that she suffered an adverse action, and that there was a causal link between the two. *T.B. ex. rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F. 3d 451, 473 (9th Cir. 2015).  "Pursuing one's rights under the ADA constitutes a protected activity." *Pardi v. Kaiser Found. Hosps.*, 389 F. 3d 840, 850 (9th Cir. 2004).  Requesting a reasonable accommodation also constitutes protected activity under the ADA. *See Valtierra v. Medtronic Inc.*, 232 F. Supp. 3d 1117, 1126 (D. Ariz. 2017) (citing *Coons v. Sec'y of U.S. Dep't of*

*Treasury*, 383 F. 3d 879, 887 (9th Cir. 2004) for its holding that requesting a reasonable accommodation was protected activity under the Rehabilitation Act, which uses the same standards to analyze discrimination claims as the ADA) (aff'd, 934 F.3d 1089 (9th Cir. 2019)). Proximity in time between the protected activity and the allegedly retaliatory decision can be evidence of retaliatory motive or a causal link. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 771 n.21 (9th Cir. 2006) (applying the same test in the First Amendment context). If Ramirez makes out her prima facie case, I then apply the rest of the *McDonnell Douglas* burden-shifting framework to her ADA retaliation claim. *Id.* at 472-73.

Viewing the facts in the light most favorable to Ramirez, a reasonable jury could find she engaged in protected activity when she requested FMLA intermittent leave for her disability on March 21 and when she requested ADA leave for her knee surgery. Although it is not clear what type of leave Ramirez requested when she initially requested leave for her knee condition on March 22, there is evidence that Wynn told Ramirez in September 2017 that she needed to provide documentation to extend her leave under the ADA, such that a reasonable jury could find that Ramirez engaged in a protected activity at this point, if not earlier. As explained above in the context of Ramirez's FMLA interference claim and her ADA disparate treatment claim, there remain questions of fact regarding whether there was a causal link between Ramirez's requesting FMLA and ADA leave and her termination, as well as whether Wynn's proffered legitimate reason for terminating Ramirez is pretextual. I therefore deny Wynn's motion on this claim.

D. *Fourth Claim – Negligent Hiring, Training, and Supervision*

Wynn argues that Ramirez's claims are barred because she cannot recover additional tort remedies where, as here, an adequate statutory remedy exists. Next, Wynn argues that there is no evidence that Wynn's employees acted dangerously towards or physically harmed Ramirez.

Further, Wynn contends that Ramirez cannot identify evidence to establish the standard of care Wynn's investigation allegedly breached.  It contends that Nevada law does not permit the inference that Wynn was negligent in training or supervising simply because Wynn's employees acted discriminatorily.  Finally, it argues there is no evidence that Wynn failed to train, hire, or supervise any employee.

Ramirez responds that employees may bring claims for negligent hiring and supervision of management personnel in the handling of employment discrimination matters.  She also contends that Wynn's assertion that she must prove physical harm remains an open question under Nevada law, and because Nevada has recognized tort liability for non-physical harm, no physical harm requirement should be imposed.  Ramirez argues Wynn had a duty to train and supervise its agents to conform to lawful practices and adhere to the FMLA and ADA's requirements, and Wynn did not do so.  She contends Wynn knew or should have known that its agents could potentially harm Ramirez when they terminated her based on their subjective, non-uniform process.

Under Nevada law, employers have the "duty to use reasonable care in the training, supervision, and retention of [their] employees to make sure that the employees are fit for their positions." *Hall v. SFF, Inc.*, 930 P.2d 94, 99 (Nev. 1996).

Whether a plaintiff must allege physical harm to pursue a claim for negligent training or supervision is unsettled under Nevada law. *See Russo v. Shac, LLC*, No. 82197-COA, 498 P.3d 1289, 2021 WL 5370814, at *9 (Ct. App. Nev. Nov. 17, 2021); *see also Robertson v. Wynn Las Vegas LLC*, No. 2:10-cv-00303-GMN-LRL, 2010 WL 3168239, at *3-5 (D. Nev. Aug. 9, 2010) (certifying the question to Supreme Court of Nevada), *Robertson v. Wynn Las Vegas LLC*, No. 56596, 373 P.3d 975, 2011 WL 3805921 at *1 (Nev. 2011) (withdrawing acceptance of certified

1   question because court dismissed case on other grounds).  In the absence of controlling state law,

2   I must predict how that court would decide the issue. *See Gravquick A/S v. Trimble Navigation*

3   *Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003).

4        I predict that physical harm is not necessary to state a claim for negligent training and

5   supervision in Nevada. *See Chocolate Magic Las Vegas LLC v. Ford*, 2018 WL 473006 at *2-*3

6   (D. Nev. Jan. 17, 2018) (analyzing persuasive California authority, Restatement authority, and

7   *Sadler v. PacifiCare of Nev.*, 340 P.3d 1264 (Nev. 2014), which analyzed the injury requirement

8   in Nevada tort law, and predicting that physical harm is not necessary for a negligent training

9   and supervision claim in Nevada); *see also Russo*, 2011 WL 3805921 at *9 (declining to "graft a

10  physical harm requirement" onto a negligent training, supervision, and retention claim in the

11  absence of Nevada authority mandating otherwise).

12       And while Nevada does not recognize a claim for tortious discharge when an adequate

13  statutory remedy already exists,[5] Wynn does not identify authority that Ramirez's negligent

14  hiring, training, and supervision claim is barred under the same theory. *See also Wilson v.*

15  *Greater Las Vegas Ass'n of Realtors*, 2015 WL 1014365 (D. Nev. Mar. 9, 2015) (reasoning that

16  Supreme Court of Nevada would find that Nevada's anti-discrimination law does not preempt

17  common law tort claims).

18       Ramirez does not argue that Wynn was negligent only because its employees acted

19  negligently.  Rather, she argues that Wynn had a duty to train and supervise its employees on the

20  FMLA and ADA's requirements.  And viewing the evidence in the light most favorable to her,

21  Ramirez has raised a genuine dispute over whether Wynn breached its duty to do so.  Questions

22  of fact remain regarding whether Wynn satisfied its internal policies and whether it adequately

23

---

[5] *Ozawa v. Vision Airlines, Inc.*, 216 P.3d 788, 791 (Nev. 2009).

trained its employees on its policies and how to carry out their roles under the FMLA and ADA. *See, e.g.*, ECF Nos. 64-6 at 19-21 (Makaiwi does not recall whether anybody went over written documents regarding how to conduct an investigation as an employee relations counselor or whether there is a policy she is to follow during investigations, but knows Wynn has procedures or practices on this), 23 (Wynn had no specific guidance, instruction, or directive on what Makaiwi had to record and save during her investigation), 25 (no one from Wynn gave Makaiwi any practice or advice on the specific way that she conducted investigations), 35 (Wynn never provided Makaiwi any guidance on what she could ask a doctor during an FMLA investigation); 76-1 at 9, 13 (Sanchez testifying that if Wynn suspected Ramirez of misusing FMLA in 2017, she should have been the one to investigate).  I therefore deny Wynn's motion for summary judgment on this claim.

**III. MOTION TO STRIKE**

Wynn moves to strike one of Ramirez's exhibits. ECF No. 70.  I did not rely on the objected-to exhibit, so I deny Wynn's motion to strike as moot.

**IV. CONCLUSION**

I THEREFORE ORDER that defendant Wynn Las Vegas, LLC's motion for summary judgment **(ECF No. 57) is GRANTED in part and DENIED in part**.  The motion is granted as to plaintiff Tiare Ramirez's claim for failure to accommodate under the Americans with Disabilities Act and Nevada Revised Statutes § 613.330.  The motion is denied in all other respects.

/ / / / /

/ / / / /

/ / / / /

I FURTHER ORDER that Wynn's motion to strike **(ECF No. 70) is DENIED** as moot.

DATED this 29th day of August, 2022.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE